948 A.2d 600

HENRY J. SHOTMEYER AND CHARLES P. SHOTMEYER, PARTNERS TRADING AS BEAVER RUN FARMS, A GENERAL PARTNERSHIP AND BEAVER RUN FARMS, L.P., PLAINTIFFS–RESPONDENTS, v. NEW JERSEY REALTY TITLE INSURANCE COMPANY, DEFENDANT–APPELLANT.

Argued November 28, 2007—Decided June 5, 2008.

76

*Dennis M. Gonski* argued the cause for appellant (*Dollinger, Gonski & Grossman*, attorneys).

*Melinda B. Maidens* argued the cause for respondents (*Jeffer, Hopkinson & Vogel*, attorneys).

*Michael J. Fasano* argued the cause for amicus curiae New Jersey Land Title Association (*Lomurro, Davison, Eastman & Munoz*, attorneys).

Chief Justice RABNER delivered the opinion of the Court.

In 1981, a general partnership, comprised of two individual partners, bought a tract of land and obtained title insurance for the property. Ten years later, the general partnership conveyed the property to a limited partnership controlled by the same two individuals. The limited partnership did not obtain a new title insurance policy. Another decade later, when the partners discovered a defect in title, they sued the insurer under the title policy originally purchased by the general partnership.

We now hold that the title insurance policy lapsed when the property was voluntarily conveyed from the general partnership to the separate and distinct limited partnership. As a result, the trial court properly granted summary judgment to the insurer. We therefore reverse the judgment of the Appellate Division.

## I.

Brothers Charles and Henry Shotmeyer formed Beaver Run Farms, a general partnership, to acquire, hold, and develop real estate in New Jersey. On June 18, 1981, the partnership purchased a tract of farmland in Sussex County from Mabel A. Day for $260,000. The grantees were recorded in the deed as "HENRY J. SHOTMEYER & CHARLES P. SHOTMEYER, Partners trading as BEAVER RUN FARMS, a General Partnership."

On June 22, 1981, defendant New Jersey Realty Title Insurance Company, now known as New Jersey Title Insurance Company, ("defendant" or "Title Company") provided an owner's policy of title insurance for the property in the amount of $260,000. Schedule A of the policy lists the named insured as "Henry J. Shotmeyer and Charles P. Shotmeyer, Partners trading as Beaver Run Farms, a General Partnership." The policy further defines "insured" as:

> the insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

The policy also contained a section entitled "Continuation of Insurance after Conveyance of Title," which reads as follows:

> The coverage of this policy shall continue in force as of Date of Policy in favor of an insured so long as such insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from such insured, or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest. . . .

As part of their estate planning, the Shotmeyers formed the limited partnership, Beaver Run Farms, L.P., on December 30, 1991. S.B. Properties, Inc., a corporation owned jointly and exclusively by the brothers, was the general partner; Henry and Charles were the sole limited partners. On January 2, 1992, in consideration of ten dollars, the general partnership conveyed the farmland purchased from Mabel Day on June 18, 1981 to "BEAVER RUN FARMS, L.P., a New Jersey Limited Partnership."

About ten years later, in late 2001, Charles Shotmeyer claims he noticed on a tax bill that the acreage for the property had been reduced from 24.7 to 12.68 acres. He later learned that two judgments had been filed with the Sussex County Board of Taxation on April 24, 2000, declaring that the missing 12.02 acres belonged to a neighboring lot.

The Shotmeyers notified the Title Company about the judgments in February 2002 and demanded compensation for their loss. The parties attempted to settle the claim, and in January 2003, the Title Company offered the Shotmeyers $43,000. The Shotmeyers rejected the offer and later forwarded an appraisal valuing the 12.02 acres at $900,000.

On February 18, 2005, Beaver Run Farms, the general partnership, filed a four-count complaint against defendant Title Company. The complaint alleged that defendant breached its obligation under the policy to pay full compensation for the disputed property (Count 1); breached its covenant of good faith and fair dealing (Count 2); violated its obligation to negotiate in good faith pursuant to *N.J.S.A.* 17B:30–13.1 (Count 3); and wrongfully refused to pay the full market value of the disputed property (Count 4).

In its answer, defendant denied the claim for relief and stated as a defense that "[p]laintiff lacks an insurable interest and therefore is not a proper party to make an insurance claim." In an amended answer, defendant asserted that "[t]he 'insured' no longer holds title to the land," which was transferred to a new and separate legal entity, Beaver Run Farms, L.P., a limited partnership.

In response, the complaint was amended to list as plaintiffs "Henry J. Shotmeyer and Charles P. Shotmeyer, partners trading as Beaver Run Farms, a general partnership, and Beaver Run Farms, L.P." (The amended complaint was filed on June 30, 2005; Henry Shotmeyer passed away in 2004.) The revised complaint alleged that the Shotmeyers conveyed the Property to themselves as limited partners, and S.B. Properties, Inc. as general partner,

in Beaver Run Farms, L.P. As a result, plaintiffs alleged that the policy remained in effect.

Defendant moved for summary judgment on October 31, 2005. It argued that the newly formed limited partnership, which owned the land, was not covered under the original policy bought by the general partnership. The trial court agreed. It ruled that the transfer from the general partnership to the limited partnership was voluntary and intentional and not done by "operation of law." The trial court noted that the general partnership continued to exist even after the transfer. Because the named insured—the general partnership—voluntarily conveyed its interest in the property, the trial court concluded that the title insurance policy lapsed and the new owner did not have standing to sue under the policy.

The Appellate Division reversed in an unpublished decision. The panel found that there was never a transfer of the Shotmeyer brothers' beneficial interests in the land, which the title insurance policy was procured to protect. The Appellate Division reasoned that the limited partnership, while a distinct legal entity, was not a stranger to the title insurance policy. Both the general and the limited partnerships were not more than alter egos of the Shotmeyer brothers, who retained control of the property at all times. As a result, the panel concluded that the corporate form of the partnerships should be disregarded in the interests of justice, because to do otherwise would exalt form over substance. The panel also noted that the Shotmeyer brothers did nothing to increase the risk to the insurer, in that the transfer did not adversely affect title to the property. In light of its reasoning, the panel did not focus at length on whether the property was transferred by operation of law. Finally, the Appellate Division rejected plaintiffs' argument that defendant waived its right to disclaim liability under the policy by its settlement offer.

This Court granted defendant's petition for certification. 191 N.J. 315, 923 A.2d 230 (2007).

## II.

Defendant argues that neither Shotmeyer brother held an interest in the land insured by the title policy at any time. Defendant contends that the general partnership purchased the property, took out a title insurance policy, and then conveyed title to a complete stranger to the policy, the limited partnership. The individual brothers were named in Schedule A of the policy only in their capacity as partners, not as additional insureds. In any event, according to defendant, the transfer of property to the limited partnership was a deliberate and voluntary conveyance to a separate legal entity. Defendant argues that the transfer did not occur by "operation of law," which would have continued the policy's coverage. Because the policy lapsed, defendant submits that the new owner, the limited partnership, was required to pay a new premium if it wished to maintain coverage.

Defendant argues that the Appellate Division rewrote the policy to extend title insurance coverage to a new entity. According to defendant, the decision's focus on the brothers' "beneficial interest" in the property deprives the industry of the certainty of knowing the exact identity of the insured. Allowing recovery under a policy after a transfer also increases the time that an insurer is exposed to risk.

Plaintiffs argue that the Shotmeyers were individually insured both before and after the conveyance of the property and that they never relinquished any interest, legal or beneficial, in the property. Rather, plaintiffs contend that the change in the form of their ownership from a general to a limited partnership was a symbolic transfer as part of their estate planning. Therefore, plaintiffs submit that there was no termination in coverage. In essence, the Shotmeyers maintain that they conveyed the property to themselves, and that equity demands the Title Company not be allowed to avoid its obligations under the policy by elevating form over substance. Plaintiffs also contend that the nature of the risk insured by the policy was not affected by the transfer, since any

defect in title existed when the Shotmeyers first acquired the property.

We granted amicus curiae status to the New Jersey Land Title Association ("NJLTA"). NJLTA supports defendant's position and argues that the Appellate Division's use of the "alter ego" doctrine is contrary to precedent, against public policy, and unfair in its allocation of insurance risks. NJLTA notes that principals are shielded from personal liability in a limited partnership, so a transfer from a general to a limited partnership imposes a higher burden on an insurer.

## III.

A title insurance policy is a contract that protects a landowner against loss caused by defective title to the land. *See Sandler v. N.J. Realty Title Ins. Co.*, 36 *N.J.* 471, 478–79, 178 *A.*2d 1 (1962); Joyce Palomar, *Title Insurance Law*, § 1:8 (2007). To recover under the policy, the defect must have existed at the time the insurance was purchased. 11 *Couch on Insurance 3d*, § 159:5 (1998). In that sense, title insurance covers "a state of ownership at a specific point in time." *Ibid.* In order to purchase title insurance, buyers make a one-time premium payment at the time of purchase. The policy then continues in force indefinitely until the insured divests title or alters title in a way that terminates coverage. *Ibid.*

Title insurance is no different from other insurance policies, in that it must be "liberally construed in favor of the insured and strictly construed against the insurer." *Sandler, supra,* 36 *N.J.* at 479, 178 *A.*2d 1. In the absence of ambiguity, an insurance policy should be interpreted according to its plain, ordinary meaning. *Zacarias v. Allstate Ins. Co.,* 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001). When an ambiguity exists, courts should interpret the contract in accordance with the "reasonable expectations" of the insured. *Proformance Ins. Co. v. Jones,* 185 *N.J.* 406, 415, 887 *A.*2d 146 (2005); *Zacarias, supra,* 168 *N.J.* at 595, 775 *A.*2d 1262. However, courts must guard against rewrit-

ing policies in favor of the insured under the guise of interpreting a contract's reasonable terms. *See Progressive Cas. Ins. Co. v. Hurley*, 166 *N.J.* 260, 273, 765 *A.*2d 195 (2001); *Di Orio v. N.J. Mfrs. Ins. Co.*, 79 *N.J.* 257, 269, 398 *A.*2d 1274 (1979).

The purposes behind those principles are evident. Policy holders should be protected from "technical encumbrances" and "hidden pitfalls" in their insurance contracts. *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961). Sophisticated insurers who unilaterally prepare complicated contracts should not be allowed to take advantage of their less sophisticated customers. See *Progressive, supra*, 166 *N.J.* at 272, 765 *A.*2d 195. However, because insurance premiums and coverage provisions are based on predictable levels of risk, title insurers need to rely on certain consistent conditions in order to calculate premium rates reliably.

## IV.

The insurance policy in this matter provided coverage to two groups: (1) the "insured named in Schedule A"; and (2) those who succeeded the named insured "by operation of law." We analyze each in turn.

## A.

The policy itself specifies the named insured: "Henry J. Shotmeyer and Charles P. Shotmeyer, Partners trading as Beaver Run Farms, a General Partnership." That language mirrors exactly the ownership listed on the deed when the property was purchased in 1981.

Title 42 addresses questions about the ownership of property by partnerships and draws distinctions between partnerships and the partners that comprise them. Under *N.J.S.A.* 42:1A–12(a)(2), land is property of a partnership if it is acquired in the name of "one or more partners with an indication in the instrument transferring title to the property *of the person's capacity as a*

*partner.*" (Emphasis added). That is what occurred here. According to the deed, the land in question was acquired by "Henry J. Shotmeyer and Charles P. Shotmeyer, *Partners trading as Beaver Run Farms, a General Partnership.*" (Emphasis added). As a result, the property belonged to the partnership and not the brothers as individuals. *See N.J.S.A.* 42:1A–11 ("Property acquired by a partnership is property of the partnership and not of the partners individually."). Had the property been acquired in the name of the brothers *without* an indication in the deed of their capacity as partners and without use of partnership assets, then the land would be presumed to be their separate property. *See N.J.S.A.* 42:1A–12(d). Therefore, relying on the language in the deed and the above statutes, when the Shotmeyers purchased land from Mabel Day, they did so only in their capacity as partners in the general partnership.

The 1992 transfer of the property did not confer individual ownership rights to the Shotmeyers either. That transfer involved a conveyance from the above general partnership to "BEAVER RUN FARMS, L.P., a New Jersey Limited Partnership." (The brothers' names no longer appear at all as grantees.) Once again, by statute, the property belonged to the limited partnership and not the individual brothers. *See N.J.S.A.* 42:1A–12(b)(1) ("Property is acquired in the name of the partnership by a transfer to the partnership in its name."); *N.J.S.A.* 42:1A–12(a)(1). Thus, after the 1992 conveyance, and at the time of the loss in particular, the limited partnership owned the land. The Shotmeyers, as individuals, never had an ownership interest in the property.

Who, then, is the named insured on the title policy? Defendant relies on the analysis of the partnership statutes and submits that Beaver Run Farms, a General Partnership, is the insured. The Shotmeyers, however, contend that because their names appear on the policy, they were also insured as individuals. Their argument rests on the more liberal rules of construction that apply to

interpreting insurance policies. *See Progressive, supra,* 166 *N.J.* at 273, 765 *A.*2d 195; *Sandler, supra,* 36 *N.J.* at 479, 178 *A.*2d 1.

Even if the Shotmeyers were insured as individuals in 1981, though, they would not be entitled to recover under the facts of this case because they did not have an insurable interest at the time of the loss. As this Court explained in *Sandler, supra,* "parties are free to contract for indemnity if the interest existed at some time during the term of the risk and upon the occurrence of the loss." 36 *N.J.* at 481, 178 *A.*2d 1; *see also* 9f–210f *Appleman on Insurance* § 5202 (2008). At the time of the loss here, in or about 2000, the property had been conveyed to a new entity-Beaver Run Farms, L.P.—which alone owned the tract of land. The brothers had no ownership or insurable interest in 2000 and therefore cannot recover under the terms of the 1981 title policy.

The Appellate Division found that the Shotmeyer brothers had never transferred their "beneficial interests" in the land and that both the general and limited partnerships were "no more than alter egos" of the brothers. The panel therefore directed the Title Company to pay out under the policy. That analysis requires closer scrutiny.

While it is true that the Shotmeyers were the only individuals connected to both partnerships, our statutes plainly provide that "[a] partnership is an entity distinct from its part-ners." *N.J.S.A.* 42:1A–9(a); *see also Gebhardt Family Inv., L.L.C. v. Nations Title Ins. of N.Y., Inc.,* 132 *Md.App.* 457, 752 *A.*2d 1222, 1223, 1226 (concluding that individual insureds and limited liability company they owned are separate entities and, therefore, title policy terminated upon conveyance of property from individuals to limited liability company), *appeal denied,* 360 *Md.* 486, 759 *A.*2d 231 (2000). Moreover, the distinct entities the brothers set up served different purposes and provided particular business and personal advantages to them. The general partner-ship was formed to invest in and develop real estate. The limited partnership was an estate planning device. The change in form had beneficial practical consequences as well. As principals of a

general partnership, the brothers could be held personally liable; as limited partners under the newly formed entity, they were shielded from personal liability. *See N.J.S.A.* 42:1A–18(a); *N.J.S.A.* 42:2A–27(a).

In addition, the brothers contend they did nothing to affect the defect in the property's title or the risk to the Title Company through their conveyances. However, one-time title insurance premiums, unlike regular casualty policy premiums, are based in part on the *time* of exposure to risk. The Chancery Division has addressed this issue as follows:

> A title insurance company which issues a policy providing coverage so long as the insured *retains any liability* with respect to the insured property would be obliged to increase its premium for that coverage, not because of any change in risk, but because of an increase in the time of its exposure to risk.
>
> [*Sylvania v. Stein,* 177 *N.J.Super.* 117, 123, 425 *A.2d* 701 (Ch.Div.1980) (emphasis in original).]

Therefore, allowing coverage to continue when a tract of land is conveyed to a different legal entity effectively extends the time of exposure and the risk to the insurer.

Ordinarily, parties to an insurance contract should be able to ascertain who is covered by looking to the plain terms of the policy. In the event of a genuine ambiguity, litigation may be necessary. Use of a "beneficial interest" test to determine the owner of a policy, however, may allow a party to "create" ambiguity in an otherwise clear situation.

Reliance on the "alter ego" doctrine to "pierce the corporate veil" does not aid the Shotmeyers either. In *State, Department of Environmental Protection v. Ventron Corp.,* 94 *N.J.* 473, 500, 468 *A.2d* 150 (1983), this Court explained that the "purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." If that purpose would be served, "courts may pierce the corporate veil by finding that a subsidiary was a mere instrumentality of the parent corporation." *Ibid.* (internal quotations and citation omitted). Even then, "liability generally is imposed only

when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Id.* at 501, 468 *A.*2d 150.

Here, the Shotmeyers set up different, legitimate business structures to further their personal and business plans. They did not use their partnerships to commit fraud or defeat the ends of justice. The alter ego doctrine, therefore, does not apply.

Accordingly, plaintiffs cannot recover as "named insureds" under the title policy.

## B.

The insurance policy also provided coverage to those who succeeded the named insured "by operation of law." The policy distinguished "operation of law" from a "purchase" of the property. The policy also listed examples of successors in interest by operation of law, namely, heirs, distributees, devisees, survivors, personal representatives, next of kin, and corporate or fiduciary successors.[1]

As the Appellate Division noted, courts generally have found that when title is passed by "operation of law," the change is automatic or involuntary. *See Egner v. Egner,* 183 *N.J.Super.* 326, 331, 443 *A.*2d 1104 (Ch.Div.) (distinguishing between voluntary lifetime transfers and involuntary transfers occurring by operation of law in context of mortgage agreements), *aff'd,* 185 *N.J.Super.* 1, 447 *A.*2d 182 (App.Div.1982); *Pioneer Nat'l Title Ins. Co. v. Child, Inc.,* 401 *A.*2d 68, 70 (Del.1979) (noting definition of "operation of law" as "the manner in which a party acquires rights without any act of his own"); *see also United States v. Seattle–First Nat'l Bank,* 321 *U.S.* 583, 587–88, 64 *S.Ct.* 713, 716,

---

[1] In 2006, the American Land Title Association amended its owner's policy to include as an insured "a grantee that is wholly owned by an affiliate of the named insured if that affiliate and the named insured are both wholly owned by the same person." Palomar, *supra,* § 4:5. The 1981 policy in this case does not include that language.

88 *L.Ed.* 944, 947–48 (1944) ("We must look only to the immediate mechanism by which the transfer is made effective. If that mechanism is entirely statutory, effecting an automatic transfer without any voluntary action by the parties, then the transfer may truly be said to be 'wholly by operation of law.'"). A voluntary transfer of assets from a dissolved corporation, pursuant to a plan of liquidation, has also been found to occur by operation of law. *Historic Smithville Dev. Co. v. Chelsea Title & Guar. Co.,* 184 *N.J.Super.* 282, 291–93, 445 *A.*2d 1174 (Ch.Div.1981), *aff'd,* 190 *N.J.Super.* 567, 464 *A.*2d 1177 (App.Div.1983). None of that happened here, though.

In 1991, the general partnership voluntarily transferred the property in question to a newly formed limited partnership in exchange for nominal consideration of ten dollars. Beyond that, the limited partnership assumed all obligations related to the land. As a result, all financial obligations were transferred from an entity in which the individual members were personally liable to one that shielded them from liability.

██ Significantly, the new limited partnership did not take over all of the general partnership's business; it assumed ownership of just the one piece of property. Thereafter, the general partnership continued to exist and carried on unrelated business activities. That carries weight in analyzing whether the policy continues to offer coverage. As one treatise explains, "the continued independent existence of both the named insured corporation and the grantee subsidiary or sister corporation" may suggest "that the grantee did *not* take by 'operation of law' as a 'corporate successor.'" Palomar, *supra,* § 4.13 (emphasis in original).

All of those considerations lead to the conclusion that the property was not transferred by "operation of law." Accordingly, plaintiffs are not covered under the express terms of the policy.

## C.

██ Plaintiffs also rely on a clause in the policy entitled "Continuation of Insurance after Conveyance of Title." That

provision states that coverage continues after a transfer "so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance." The 1992 deed did include the following covenant: "The Grantor promises that the Grantor has done no act to encumber the property. This promise is also called a 'covenant as to grantor's acts' (N.J.S.A.46:4–6)."

By statute, a covenant against grantor's acts covers only the grantor's conduct. *See N.J.S.A.* 46:4–6. Therefore, if the general partnership had caused a defect or allowed one to occur, the limited partnership could bring a claim against the general partnership, which in turn could seek indemnification from the Title Company. In this case, because the defect in title existed before the general partnership purchased the land, the covenant does not come into play.

### D.

■ Finally, we agree with the Appellate Division that defendant's offer to settle the claim was in no way a waiver of any policy defenses it might have. After getting notice of the claim, defendant acknowledged that it "may well present a compensable event." Defendant then investigated the claim, appraised the property, and offered $43,000 in settlement.

Defendant's conduct hardly rises to the level of "waiver"—a "voluntary and intentional relinquishment of a known right." *Merchs. Indem. Corp. of N.Y. v. Eggleston,* 68 *N.J.Super.* 235, 253, 172 *A.*2d 206 (App.Div.1961), *aff'd,* 37 *N.J.* 114, 179 *A.*2d 505 (1962); *see also Knorr v. Smeal,* 178 *N.J.* 169, 177, 836 *A.*2d 794 (2003) ("The party waiving a known right must do so clearly, unequivocally, and decisively."). To the contrary, offers of settlement should be encouraged and not used against a party. For that reason, *N.J.R.E.* 408 does not allow settlement negotiations to be admitted as proof of liability. Nor should an offer of compromise, without more, be deemed a waiver of one's right to defend a lawsuit on the merits.

■ To be sure, an insurer's "[u]nreasonable delay in disclaiming coverage, or in giving notice of the possibility of such a disclaimer, ... can estop an insurer from later repudiating responsibility under the insurance policy." *Griggs v. Bertram*, 88 *N.J.* 347, 357, 443 *A.*2d 163 (1982). We need not consider whether defendant unreasonably delayed denying coverage in this case, though, because plaintiffs have not shown any prejudice. Under well-settled law, prejudice is critical to a finding of estoppel. *Id.* at 358, 443 *A.*2d 163.

## V.

This case highlights the need for special care when transferring assets as part of an estate plan. Particular attention must be given to title insurance policies when real property is transferred.

For the reasons set forth above, we are compelled to reverse the judgment of the Appellate Division and reinstate the judgment of the Law Division.

*For reversal and reinstatement*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.